229 N.J. Super. 230 (1988)
551 A.2d 177
JOHN THOMPSON, AN INFANT BY HIS GUARDIAN AD LITEM, CAROL THOMPSON AND CAROL THOMPSON, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
MERRELL DOW PHARMACEUTICALS, INC.; MASSIMO MARESCA, M.D. AND WILLIAM KAUFMAN, M.D. T/A SHORE AREA OB/GYN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 1, 1988.
Decided December 7, 1988.
*232 Before Judges DEIGHAN and LANDAU.
John R. Connelly, Jr., argued the cause for appellants (Drazin and Warshaw, P.C., attorneys; John R. Connelly on the brief).
Peter N. Perretti, Jr., argued the cause for respondent Merrell Dow Pharmaceuticals, Inc. (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Peter N. Perretti and Jeffrey J. Miller on the brief).
Thomas Heavey argued the cause for respondents Maresca and Kaufman, t/a Shore Area Ob/Gyn (Grossman & Krutschnitt, P.C., attorneys; Barbara Ann Jacob on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Plaintiffs John Thompson, an infant, by his Guardian ad litem, Carol Thompson, and Carol Thompson, individually[1] instituted a malpractice action against defendants for deformities sustained at birth by John as a result of Carol's ingestion *233 of Bendectin[2] during the early stages of her pregnancy. The drug is manufactured by defendant Merrell Dow Pharmaceuticals, Inc. (Merrell Dow) and was allegedly prescribed by defendant obstetricians Massimo Maresca, M.D. and William Kaufman, M.D., trading as Shore Ob/Gyn, plaintiff's original obstetricians.
Plaintiffs filed an action against Merrell Dow for breach of expressed and implied warranties of fitness and merchantability, and strict liability in the manufacture and distribution of a defective product. Plaintiffs contend that the doctors were negligent in prescribing the drug and failing to warn plaintiff Carol Thompson of its dangers. They also contend that the doctors are liable under the concept of strict liability. Plaintiff John sued for the birth defects he sustained as the result of his mother's ingestion of the drug, and plaintiff sued for loss of consortium.
Summary judgment was entered in favor of defendant doctors after plaintiff conceded that she had no medical expert who could testify that they had deviated from acceptable standards of medical care in allegedly prescribing the drug to her. The motion judge also rejected plaintiffs' claim under strict liability against the medical doctors. After commencement of the trial against Merrell Dow, the trial judge refused to qualify plaintiffs' expert as a witness on the issue of causation. Since plaintiff had no other expert on that issue, the trial court granted defendants' motion for a judgment of involuntary *234 dismissal. R. 4:37-2(b). Plaintiffs also challenge an order which bifurcated the issues of liability and damages.
Plaintiff further challenges the trial court's refusal to allow her to introduce into evidence the transcripts or video taped testimony of 12 expert witnesses who had testified at a consolidated proceeding in the United States District Court in Ohio. In re Richardson-Merrell, Inc. Bendectin Products, 624 F. Supp. 1212 (S.D.Ohio 1985), aff'd in part, vacated in part, and remanded, sub nom. In re Bendectin Litigation, 857 F.2d 290 (6th Cir.1988) (hereinafter Bendectin Products). This action was brought by a group of plaintiffs who sued Merrell Dow for birth defects allegedly caused by Bendectin.
Essentially, the relevant facts concerning the legal issues raised are not in dispute. Plaintiff became pregnant sometime during the end of May or the beginning of June 1980. She first consulted with Drs. Maresca and Kaufman in August 1980. She testified that beginning in June she was nauseous every morning and that she vomited and felt light-headed. On her first visit Dr. Kaufman gave her an internal examination and some vitamins and iron. On her second visit, approximately two weeks later, she stated that Dr. Kaufman gave her a prescription for Bendectin for her symptoms. She claimed that she had the prescription filled and took approximately three pills each day for a period of two weeks until the prescription ran out. Since she did not feel any better, she spoke to Dr. Wiley, her family physician who advised her to stop taking the Bendectin. She testified she took no other drugs before her son, John, who was born on March 1, 1981, was delivered by another doctor. It was stipulated that John was born with three birth defects: an imperforate anus, one kidney, and a microphalalmic (abnormally small and blind) right eye. Plaintiff claimed that there were no warnings concerning Bendectin and that, had she been told about the risks of Bendectin to her baby, she would not have taken the drug.
*235 Plaintiffs' only expert, Dr. Earl E. Aldinger, has a Bachelor of Science degree in chemistry, a Master of Science degree in pharmacology, and a Doctor of Philosophy degree in pharmacology. He taught pharmacology and toxicology from 1961 until 1973, when he had become the director of basic science research at the United States Public Health Service Hospital in Louisiana. He also did research over the years in the fields of cardiovascular pharmacology, physiology and biochemistry. In 1980, he went into semi-retirement and in 1982 became a clinical consultant. Aldinger had won two awards in the field of heart research and wrote 22 articles which appeared in various publications dealing with the effects of drugs on animals used in experimentation. He admitted that all of these articles and all of his research dealt with the cardiovascular field only and that he never performed any drug screening, drug evaluation, or experimental or laboratory work on Bendectin. On November 8, 1985, he gave a terse written opinion concerning the causal relation between John's present condition and Bendectin:
John Thompson was born with severe birth defects on March 1, 1981 at Monmouth Medical Hospital (Center). These defects included a non-patent anus (imperforate anus), absence of a kidney and blindness in the right eye. The child underwent a colostomy on March 1, 1981, cystoscopy on March 16, 1981, surgical repair of his imperforated anus on March 27, 1982, excision of rectal prolapse on September 16, 1982 and closure of the colostomy on November 1, 1982.
The patient's mother, Carol Ann Thompson, was prescribed the antinausea drug Bendectin (doxylamine succinate and pyridoxine hydrocholoride) during her first trimester of pregnancy. The fetus is in a crucial stage of development during this period of gestation and is extremely susceptible to the toxic effects of drugs. Bendectin has been shown to have severe terotogenic effects in both animals and humans.
It is my professional opinion as a pharmacologist that Bendectin was the probable cause of John Thompson's severe birth defects.
All opinions expressed above are with probable medical[*] certainty and I will support them at deposition and in court.
[*] On deposition, he admitted that he could not give a medical opinion and his report was changed to read "with a probable pharmaceutical certainty."
On voir dire Aldinger admitted that he was prepared to give only a pharmacological opinion as to the toxic effect of Bendectin. On cross-examination, he further conceded that the relationship *236 between Bendectin and John's physical condition would have to be determined by a physician:
Q. Is it my understanding, sir, that you believe that you are here to give an opinion upon the issue of a product known as Bendectin and whether or not that product caused a birth defect in the fetus of a pregnant woman; in other words, caused an adverse birth outcome?
A. No, I'm here to give a pharmacological opinion as to Bendectin and what the toxic effect of this drug has been shown to do and can do.
Q. On 
A.  and how it relates to this child would have to be up to the physician.
Aldinger acknowledged that he was not qualified to render a diagnosis on the etiology, or cause, of John's condition, and that such a diagnosis would have to be made by a physician. He also acknowledged that he was not qualified to render an opinion in the fields of teratology (the study of the malformation of an embryo or fetus) or epidemiology (the study of the rate of occurrence of a disease or the effects of drugs on such diseases).
Defendant then moved to preclude Aldinger from further testimony because of his lack of expertise. At this point plaintiffs' attorney, at a sidebar conference, requested an opportunity to re-open his direct examination concerning the background and expertise of Aldinger concerning "the particular studies that he's [Aldinger] done that enable him to offer an opinion as to the effects of Bendectin on the baby in this case." Plaintiffs' counsel related that Aldinger relied on some four publications to formulate his opinion.[3] At this point Judge Selikoff suggested an Evid.R. 8 hearing to further determine whether the witness could offer an expert opinion on the issue of causation between Bendectin and John's physical condition at birth. However, defense counsel was permitted to finish his initial voir dire cross-examination before the jury during which *237 he again admitted that he was not qualified to examine John concerning the cause of his condition.
After further cross-examination, plaintiffs' counsel renewed his application for an opportunity to re-open direct examination on voir dire in order to attempt to demonstrate that Aldinger was
a qualified pharmacologist even though he has not dealt with this particular drug based upon his studies which I would develop if I get past this stage  that based upon his studies of the drug as reported in the literature is qualified to offer his opinion as a pharmacologist of the effects of the drug.
At the Rule 8 hearing, Aldinger again testified that he had never done any "hands-on" work regarding the effects of Bendectin, the effects of any drug on any area other than the cardiovascular system, or the effects of any drug on a developing embryo or fetus. He claimed that he had studied antihistamines, a group in which one of the components of Bendectin belonged, and that he knew that antihistamines were known to be teratogenic, i.e., causing defects in embryos or fetuses.
Aldinger's opinion that antihistamines could have a teratogenic effect was based solely on what he had read, largely in preparation for this litigation. Aldinger then referred to a list of teratogenic drugs published in Casarett and Doull's Toxicology. Actually this list was only of drugs "thought" to be teratogenic but which had never been so proven. Moreover, Bendectin itself was not on the list of teratogenic drugs, but only antihistamines as a group was on the list.[4] Nevertheless, Aldinger opined that all antihistamines were central nervous system depressants and since the molecular weight of doxylamine succinate (the component of Bendectin which was classified as an antihistamine) was less than 600, it could pass through the placenta barrier and reach the fetus. Based on *238 this, Aldinger felt that Bendectin probably played a part in John's birth defects. While Aldinger relied upon the table entitled "Drug and Chemical Toxicity in the Human Fetus" at page 171 for his opinion that Bendectin is a teratogen, page 172 of the same publication states:
Antihistamine antiemetics, such as meclizine and cyclizine, used in treatment of nausea and vomiting of early pregnancy, have also been incriminated as suspect teratogens. Large doses of meclizine produce a high incidence of cleft palate in rats. The evidence, although scanty, circumstantial, and mostly retrospective, prompted one European country to remove the drug from the market. Subsequently, other studies emerged, some incriminating the drug as teratogenic and others declaring it innocent. Retrospective studies have been inconclusive and prospective data available do not show any cause-and-effect relationship. [Emphasis supplied.]
In forming his opinion, Aldinger also relied upon a 1981 article in 2 Lancet (1981), a British medical journal, which was written by J.B. Hall, whom he believed to be the editor. He pointed out that the article demonstrated that doxylamine succinate was responsible for five out of 1,000 malformations at birth. Id. at 154-155.
On cross-examination of Aldinger concerning the validity of the letter in the Lancet publication, it was revealed that the article he relied upon actually was a letter to the editor by a layman who is the parent of an English child with birth defects. J.B. Hall, the writer, signed himself as the Secretary to the Debendox Action Group, a parents' association which seeks to promote litigation on behalf of children with birth defects allegedly attributable to Debendox, the English tradename for Bendectin. The letter to the editor by Hall was followed by an editor's note.
A paper ... in last week's B.M.J. [British Medical Journal], with some information on the timing of ingestion, concluded that `Debendox' "is not specifically incriminated as a cause of fetal malformation." The Committee on Safety of Medicines [C.S.M.] has reached a similar conclusion. [Id. at 155; emphasis supplied.]
Page 159 of that volume of Lancet states that, "[t]he C.S.M. sticks to its view of `Debendox' ... there is no scientifically acceptable evidence that Debendox causes harm to the fetus."
*239 Finally, Aldinger claimed that he had relied on an article written by Kolata and found on page 518 of the October 31, 1980 issue of Science, entitled "How Safe is Bendectin?" The article was a report by a layperson of a hearing conducted by the Federal Drug Administration concerning evidence that Bendectin causes birth defects. The sub-heading of the article stated that "An FDA panel sees no evidence that it causes birth defects" and the article concluded that:
In the end, the discussion of Bendectin's safety came down to reasoning that more studies have been done on Bendectin than on any other prescription or non-prescription drug taken by pregnant women and nothing has shown that the drug is dangerous. Scientists at the FDA meeting also said that every agent that is known to cause birth defects causes a recognizable syndrome. No such syndrome has been associated with Bendectin. Since 30 million pregnant women have taken the drug, Jick says, he "would find it a shocking fluke if something were going on with the drug that we have missed."
During the cross-examination a copy of the article was supplied to the trial judge.
At this point, Judge Selikoff stated "I think I have heard enough" and invited a termination of the cross-examination and a renewal of defendants' motion. Defense counsel then made an offer of proof concerning other articles upon which Aldinger relied in support of his testimony but the court responded "you don't have to."
The judge then ruled that the underlying bases for the witness' conclusions were not demonstrated to be of sufficient reliability to allow the witness to testify. He noted that Aldinger conceded that the issue of causation must be established by doctors, and that he had no experience with Bendectin. Moreover, Aldinger made a "quantum leap" from Toxicology's note of antihistamines being a suspected teratogen to the conclusion that Bendectin was the probable cause of John's birth defects. The limited research which the witness had attempted to familiarize himself with was not extensive enough to be reliable. Thus, citing the relevant legal standard, Judge Selikoff granted defendants' motion to bar Aldinger's testimony. Since the *240 plaintiff had no further evidence to offer on the issue of causation, the judge granted defendants' motion for dismissal.
On this appeal plaintiffs contend that: (1) the order barring Dr. Aldinger's expert testimony on the issue of causation was clearly erroneous; (2) the motion court abused its discretion by issuing a pretrial order barring plaintiff from moving into evidence the trial testimony of 12 of the experts who testified in In re Richardson-Merrell, Inc. Bendectin Products, 624 F. Supp. 1212; (3) the court abused its discretion by bifurcating the issue of liability from the issue of damages; (4) the court erred in granting summary judgment for the defendant doctors, and (5) the court erred in refusing to grant a stay.

I
In their first issue, plaintiffs argue that the trial court erred in barring Aldinger's expert testimony because of his lack of expertise.
Evid.R. 56, which permits opinion testimony in certain instances, provides that a witness who is qualified pursuant to Evid.R. 19 as an expert by virtue of his knowledge, skill, experience, training or education "may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." Evid.R. 56(2). Thus, in order for expert testimony to be admissible, the rule sets forth three requirements: (1) the testimony must concern subject matter beyond the ken of the average juror; (2) the field must be at a state of the art such that the expert's testimony can be deemed sufficiently reliable, and (3) the witness must have sufficient expertise to offer the intended testimony. State v. Kelly, 97 N.J. 178, 208 (1984).
Here, neither the first nor second requirement is at issue; rather, the issue is the sufficiency of Aldinger's expertise as a pharmacologist to render an opinion that the Bendectin ingested by plaintiff caused severe birth defects to the infant *241 John. Since the purpose of expert testimony is to aid the court and jury in determining the question at issue, State v. Cavallo, 88 N.J. 508, 518 (1982), the testimony must be reliable. Id. An expert witness must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion. Hake v. Manchester Township, 98 N.J. 302, 314 (1985).
Defendant contends that the decision to preclude plaintiffs' proposed expert from testifying as to the critical medical causation issue was correct for two reasons. First, Aldinger admitted that since he was a pharmacologist and not a medical doctor, he was not qualified to render an opinion on the specific medical causation of the infant plaintiff's injuries. In addition, defendant argues that Aldinger's alleged "expertise" in this field was based solely on a few articles he read in preparation for his testimony.
In Tabatchnick v. G.D. Searle & Co., 67 F.R.D. 49 (D.N.J. 1975), a pharmaceutical products liability action involving oral contraceptives, the plaintiffs sought to introduce the testimony of a neurosurgeon who was not an expert on oral contraceptives. Despite this, the witness concluded that there was a causal relationship between the use of the defendant's product and the plaintiff's injuries.
In precluding the witness from testifying, the District Court stated that:
While Fed.Evid.Rule 704 and N.J.Evid.Rule 56(3) both allow the expert's opinion to "embrace the ultimate issue" to be decided, neither rule allows a bare conclusion which lacks supporting data and rationale leading to that conclusion. The sole justification and purpose of expert testimony is to assist the trier of fact to find a solid path through an unfamiliar and esoteric field.

This is most important where the issue is the probability of cause-and-effect and distinguished from mere association, and it is especially important when the subject is emotionally charged, as it is here.
* * * * * * * *
To allow a bare conclusion to be expressed by the new expert who concedes that he lacks the competence to provide etiology for oral contraceptives *242 would fail to meet that standard. His testimony could only confuse or mislead a jury. [67 F.R.D. at 55, emphasis added.]
Next defendants contend that plaintiffs' expert testified that he acquired his knowledge concerning Bendectin not from professional experience, but solely from very limited library research conducted in preparation to testify in the present case. They argue that the record "reveals that the quality of that limited research was so inadequate and incompetent ... that it totally lacked an indicia of reliability." As the Supreme Court stated in Windmere, Inc. v. International Ins. Co.,
There are generally three ways in which a proponent of expert testimony or scientific results can prove the required reliability in terms of its general acceptance within the professional community: (1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony. [105 N.J. 373, 379 (1987)]
Accord Rubanick v. Witco Chemical Corp., 225 N.J. Super. 485, 499-500 (Law Div. 1988). Although a witness' expertise may be acquired by occupational experience as well as by scientific study and may be acquired "by study without practice or by practice without study," State v. Chatman, 156 N.J. Super. 35, 41 (App.Div. 1978), certif. den. 79 N.J. 467 (1978) (citations omitted), neither Aldinger's occupational experience nor his research of literature qualify him as an expert in this matter.
We are satisfied that Aldinger sadly lacked the credentials necessary to support his testimony as being reliable enough to aid the jury in its deliberations. He never performed research concerning Bendectin, never studied developing embryos, never ventured outside the cardio-vascular field and never examined the infant plaintiff and was not qualified to do so. Aldinger ventured a net opinion without any past medical history of plaintiff and without any knowledge of the facts and circumstances concerning the dosage prescribed for plaintiff and the number of times that plaintiff ingested Bendectin. The superficial "research" conducted by Aldinger cannot reasonably be considered a proper foundation for his opinion. An expert's *243 opinion which lacks a proper foundation is "not worthy of consideration." Jakubowski v. Minnesota Mining and Mfg., 42 N.J. 177, 187 (1964); see also Buckelew v. Grossbard, 87 N.J. 512, 524 (1981) ("[A]n expert's bare conclusions, unsupported by factual evidence, is inadmissible.").
Aldinger's lack of knowledge of various studies was fully demonstrated as it was somewhat embarrassingly revealed that the witness, in order to prepare himself for his testimony, merely read some four or five articles, out of some 40 articles written about Bendectin, which he deemed to be in plaintiffs' favor. The testimony on voir dire amply demonstrated that the majority of the written material on which Aldinger had relied was either suspect to begin with or was seriously misquoted by him. Aldinger was not prepared to testify that Bendectin was an unsafe product or that, with a reasonable degree of medical probability, it caused the defective condition sustained by John at birth. His research on the teratogenicity of Bendectin was so inadequate and incompetent that it lacked any indicia of reliability. Cf. Rubanick, 225 N.J. Super. at 501-502.
It should be noted that there is an abundance of authoritative scientific literature and judicial decisions which acknowledge the general acceptance of expert testimony concerning Bendectin. See Richardson v. Richardson-Merrell, Inc., 649 F. Supp. 799 (D.D.C. 1986), aff'd 857 F.2d 823 (D.C. Cir.1988); Lynch v. Merrell-National Laboratories, 646 F. Supp. 856 (D.C.Mass. 1986), aff'd 830 F.2d 1190 (1st Cir.1987); Bendectin Products, 624 F. Supp. 1212. However, the expert testimony proven reliable by these methods has been contrary to plaintiffs' position. But see Oxendine v. Merrell Dow Pharmaceuticals, Inc., 506 A.2d 1100 (D.C. 1986) (trial court, which had granted defendant judgment n.o.v., erred in concluding that if each of four types of scientific data, "viewed in isolation, was insufficient to prove that Bendectin caused birth defects, then *244 all of them taken together could not prove it either." Id. at 1104).[5]
For example, in Bendectin Products, the District Court of Ohio, in denying plaintiff's motion for judgment n.o.v. and upholding the verdict in favor of the defendant, reviewed the testimony of 19 experts on the issue of the causal relationship between Bendectin and birth defects.[6]
In Lynch, the defendant Merrell-National supported its motion for summary judgment on an extensive record consisting of excerpts of the deposition and trial testimony of the 19 expert witnesses in Bendectin Products, numerous Bendectin epidemiological studies, and an appendix containing a list of other Bendectin cases and an index of the Bendectin multi-district litigation. 646 F. Supp. at 857. Based on the record in the Bendectin Products case, the District Court in Lynch granted the summary judgment on the basis that the evidence on the issue of causation of birth defects by Bendectin was insufficient to present a jury question based upon epidemiological studies[7] and extrapolation from in vivo[8] studies.
*245 The Court of Appeals affirmed the conclusions of the District Court and supplemented those conclusions with its own review and analysis. 830 F.2d at 1193-1194. The court concluded as a matter of law that, based on the record and medical and scientific literature, "world-wide scientific investigations of Bendectin have produced no evidence establishing that Bendectin causes limb reduction, and ... the irrelevance of Bendectin to the incident of limb defects has been demonstrated." Id. at 1194.
In Richardson, the Court of Appeals, quoting the District Court, noted that:
Excepting their own empirical observations, the "literature" is to scientists both the ultimate authority as to and the most respected repository of scientific knowledge. And the literature on Bendectin, individually and in the aggregate, fails to demonstrate Bendectin's teratogenicity to a scientifically acceptable degree of accuracy. [857 F.2d at 826 (quoting Richardson, 649 F. Supp. at 802).]
Here, it is fair to conclude that Aldinger lacked the necessary credentials to qualify as an expert on the causation of birth defects caused by Bendectin and to present reliable testimony to aid and assist the jury in its deliberations. Moreover, his opinion is so out of step with authoritative scientific literature and persuasive judicial decisions so as to be totally unacceptable.
We are satisfied there is no merit to plaintiffs' contention that Aldinger was qualified as an expert on the causal connection between Bendectin and John's birth defects and that the trial judge properly excluded his testimony.

II
On March 25, 1986, plaintiff notified Merrell Dow that she intended to offer into evidence "discovery deposition testimony and/or video tape testimony" of 12 additional expert witnesses *246 who had testified in the Bendectin Products case in the United States District Court in Cincinnati, Ohio. Merrell Dow noted its objection and then moved for an order to strike plaintiff's late designation of expert witnesses on the ground that it violated the pretrial order. Merrell Dow relied upon an affidavit of defense counsel and voluminous documents and supporting exhibits. After argument Judge Farren, the motion judge, entered an order granting Merrell Dow's motion to strike the designation of the expert witnesses.
Plaintiff contends that the motion judge abused his discretion in entering an order prior to trial barring her from using transcript testimony of 12 of the expert witnesses who testified in the Bendectin Products proceedings. The record before us does not indicate whether the testimony was barred because of plaintiff's violation of the rules of discovery, her violation of the pretrial order, or for other grounds. While the proffered testimony could have been denied for failure to comply with pretrial discovery and the pretrial order, we are satisfied that it was properly denied on other grounds.
In the Bendectin Products case, a large group of similarly-situated plaintiffs brought suit against an affiliate of Merrell Dow concerning the causal connection between Bendectin and deformed births.[9] A total of 19 expert witnesses testified, ten for plaintiffs and nine for defendants. They testified solely regarding the common issue of causation by Bendectin and defective births. The jury in that action returned a verdict in favor of the drug manufacturer.
In the present case, at the motion prior to trial to strike plaintiff's designation of expert witnesses, defendant argued *247 that the designation of witnesses violated not only the terms of the court's pretrial order, but also the evidence rules prohibiting hearsay testimony. Defense counsel also filed an affidavit in which it was noted that the Bendectin Products case never addressed the plaintiffs' particular birth defects at the trial, that the trial had concerned the causation issue only, and that the combined deposition testimony of the 12 expert witnesses named by plaintiff comprised 3,346 pages, and that the combined trial testimony of these witnesses comprised 1,750 pages.
Plaintiff argued that Merrell Dow could not claim surprise or prejudice because it was a party to the federal litigation and had access to the transcripts. Counsel also argued that the hearsay rules were not violated because these expert witnesses were "unavailable" since they were beyond the jurisdiction of the court's process to compel appearance.[10]
Defendant contends that two critical requirements of Evid.R. 63(3) were not met here. First, that the witnesses were not "unavailable" and second, that defendant's opportunities and motives for cross-examination during the federal proceeding *248 were not sufficiently similar to its interests and motives in this proceeding. With regard to this second requirement, the defendant argues that, since the issue in Bendectin Products was proximate cause only and not liability to the particular plaintiffs, the type of cross-examination there was very different from the type of cross-examination it would have conducted in the present case. Moreover, it noted that numerous additional studies and articles have been published since the trial of Bendectin Product in March 1985, each of which would have presented important opportunities for the cross-examination of plaintiff's proposed expert witnesses.
Generally there are three essential requirements which must be met in order to use testimony from a prior proceeding: (1) the prior proceeding must have involved substantially the same issues; (2) the party against whom the testimony is sought to be used (or someone having a similar interest) must have had a fair opportunity and adequate motive to cross-examine the witness in the earlier proceeding; and (3) the witness must be unavailable to testify in the present case. Carter-Wallace, Inc. v. Otte, 474 F.2d 529, 535 (2d Cir.1972), cert. den. 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); McCormick, Evidence, §§ 255-258 at 616-622 (1972 ed.).
From our review of Bendectin Products, Lynch v. Merrell-National Laboratories, and Richard v. Richardson-Merrell, Inc., we are satisfied that the issue in the Bendectin Products case was substantially similar to that in the present case. The issue in Bendectin Products essentially was "does Bendectin cause birth defects?" 624 F. Supp. at 1222. The precise question submitted to the jury was:
[Have] plaintiffs established by a preponderance of the evidence that ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is a proximate cause of birth defects? [624 F. Supp. at 1267.]
The purpose of the trial of Bendectin Products was to determine all common issues of liability. Id. at 1216. The issue of causation was considered during the first phase of the trial. Id. at 1247; 857 F.2d at 296. In the event that the jury had *249 found causation it would then be required to determine which category of birth defects were approximately caused by the ingestion of Bendectin.
Although we are satisfied that the present proceeding involves substantially the same issue as presented in the Bendectin Products case, we are concerned whether Merrell Dow had a fair opportunity and adequate motive to cross-examine the witnesses concerning the specific defects suffered by plaintiff John in the present case. Even assuming that there was testimony concerning the categories of defects in the Bendectin Products case, the issue here goes beyond general causation. Plaintiffs were required to prove that Bendectin caused John's birth defects, even though the claim against Merrell Dow is on the theory of strict liability. See, e.g., Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 209 (1984); Feldman v. Lederle Laboratories, 97 N.J. 429, 449 (1984); Milchalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394 (1982). In other words, the plaintiffs were required to supplement the issue of causation as to the particular facts and circumstances in the present case.
The similarity or substantial similarity of the issue in the Bendectin Products case does not automatically relieve plaintiffs of their burden of proof. Even Dr. Allen K. Done, a pharmacologist and toxicologist who testified on behalf of plaintiffs in the Bendectin Products, Richardson and Oxendine cases as an epidemiologist, admitted that the cause of 75% to 80% of all birth defects is unknown. Lynch, 646 F. Supp. at 863. In Richardson, the Court of Appeals concluded "that Dr. Done's opinion lack[ed] an adequate basis and therefore, whether viewed alone or in conjunction with those of other experts, [it] did not provide the `substantial probative evidence' that would require us to leave the verdict as the jury rendered it." 857 F.2d at 829 (footnote omitted).
Epidemiology is often used to determine whether a particular drug or treatment has caused an adverse effect in some patients *250 or in a particular patient. Valore, II The New Jersey Trial Lawyer, 66, 67 (Issue II, August 1988). Although epidemiology cannot be used to predict the occurrence of a health related event for a given specific individual, it may be used to predict health related events for an entire population. Id.
"Clinical epidemiology approaches cause and effect at two levels. Level 1  did the drug (or exposure or treatment) cause an adverse effect in some patients? Level 2  did the drug (or exposure or treatment) cause an adverse effect in this particular patient?" Id. (emphasis in original). "A clinical epidemiologist applies a second set of causation tests for the individual case to answer the question: Did the drug, exposure or treatment cause an adverse effect in this particular patient?" Id. at 69 (citing D. Sackett, R. Haynes & P. Tugwell, Clinical Epidemiology, A Basic Science for Clinical Medicine Ch. 9 at 235 (1985)).
Here, plaintiffs admitted that "[t]he first phase of the trifurcated trial of In re Bendectin Products Liability Litigation dealt with the question of causation in the abstract [through testimony of] a number of experts in embryonic and developmental biology, pediatrics, pharmacology, human epidemiologic and tetratology". (Emphasis supplied.) They then proposed that: "In the present case, the plaintiffs intended to offer the transcripts solely as to the general issue of causation, that is, the issue of whether or not there exists a causal relationship between maternal ingestion of Bendectin during early pregnancy and birth defects." (Emphasis supplied.)
In our view, Merrell Dow was entitled to cross-examine the proffered expert witnesses' testimony based on information revealed in supplemental articles and literature concerning the causal relationship between Bendectin and birth defects. Moreover, since plaintiffs admit that the proffered transcripts of testimony of 12 experts was "solely as to the general issue of causation" (which has been scientifically and judicially rejected) and since plaintiffs have failed to list any other expert on *251 specific causation, even if the transcripts of the experts in the Bendectin Products Case were admitted, plaintiffs still would not have established a prima facia case.

III
Plaintiffs argue that the motion judge abused his discretion in issuing a pretrial order barring plaintiffs from using the trial testimony of the experts in the prior case of Bendectin Products. They point out that under Evid.R. 63(3) there are four conditions required in order to use the testimony taken in a prior action: (1) there must be prior notice, pursuant to Evid.R. 64, of intention to offer the testimony; (2) the witness whose testimony is to be offered must be unavailable; (3) the testimony must have been taken in compliance with the law, and (4) the issue must be such that the adverse party had a right and opportunity to cross-examine in the first case and had an interest and motive similar to that in the present case. Plaintiffs submit that all four conditions were met in the present case.
Here we are not concerned with the first three procedural requirements with respect to the proffered testimony, which are not seriously contested by Merrell Dow. However, plaintiffs assume that since the proposed expert witnesses are "beyond the jurisdiction of the court's process to compel appearance," Evid.R. 62(6)(b), that they are ipso facto entitled to submit the transcripts of the prior testimony in Bendectin Products. We disagree.
In support of their argument, plaintiffs rely upon Sacawa v. Polikoff, 150 N.J. Super. 172 (App.Div. 1977) where we held that in a medical malpractice action, where plaintiff's expert witness in the first trial was a resident of Florida at the time of the retrial, the testimony of the expert in the former trial was admissible in the retrial under Evid.R. 62(6). The trial judge interpreted the Rule to require that not only must the witness be beyond the jurisdiction of the court's process, but that the *252 proponent must also use due diligence to procure the attendance of the witness. Id. at 179. We held that the Rule was in the disjunctive and that the testimony was admissible under Evid.R. 62(6)(b).
On the other hand Merrell Dow relied, among others, upon Carter-Wallace, Inc. v. Otte, 474 F.2d 529, where Judge Friendly held that before the former testimony of an expert witness can be used, there should be some showing, not only that the witness is unavailable, but that no other expert of similar qualifications is available or that the unavailable expert has some unique testimony to contribute. Id. at 536-537. He reasoned that when a fact witness is unavailable a unique knowledge of the facts will be lost unless the prior testimony is allowed. But, he pointed out, an expert witness generally has no knowledge of the facts and even if one expert is unavailable, there is no need to use the previous testimony to present the evidence because there usually would be other experts available to give similar testimony orally. Id. at 536.
We agree with the rationale of Judge Friendly in Carter-Wallace, Inc. v. Otte, that expert witnesses are not unavailable simply because they are not subject to service of process. When expert testimony is necessary in the presentation or defense of a cause of action, it is incumbent on each litigant to seek out experts who support their respective contentions. When an expert to support the litigant's position is found, it behooves counsel to consult with the expert witness to review the facts, examine the record and discuss the theory of the claim or a defense of the client. At the same time, it is the responsibility of trial counsel to discuss fees for consultations, review of opposing experts' opinions and voluntary attendance at trial. If the expert is beyond the jurisdiction of the court to compel attendance at trial, it is the responsibility of the party offering the expert to ascertain the willingness and availability of the expert to appear at trial. The proponent of the expert must attempt to arrange a trial date at which the *253 expert can appear. Since the expert is under the control of the offering litigant, due diligence must be used to secure the attendance of the witness at trial. State v. Hamilton, 217 N.J. Super. 51, 55 (App.Div. 1987) certif. den. 108 N.J. 581 (1987), citing Barber v. Page, 390 U.S. 719, 724-25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255, 260 (1968).
In Hamilton, we held that receiving the transcript of the testimony of a witness who had testified at a previous trial was reversible error of federal constitutional dimension. Id. at 56. We pointed out that the State failed to act "with due diligence" and that "[n]o effort was made to enlist the aid of local police or prosecuting authorities ... to locate the witness" in Richmond, Virginia. Id. at 55. We further noted that no effort was made by the State to secure the witness' attendance at trial through the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, N.J.S.A. 2A:81-18 et seq., which is known as the Interstate Compact.
In Barber v. Page, a witness who had given testimony at a previous judicial proceeding against the same accused was incarcerated in a Federal penitentiary at the time of the second State trial for armed robbery. 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255. The State introduced the transcript of the witness' prior testimony at a preliminary hearing at which the petitioner's counsel did not cross-examine the witness. The United States Supreme Court held that unless the prosecution had made a good faith effort to obtain the presence of an absent witness at trial, such witness is not "unavailable" for the purposes of the exception to an accused's constitutional rights to confrontation. The Supreme Court pointed out that under a federal statute and state Writs of Habeaus Corpus Testificandum, federal prisoners could be produced for trial in state courts. 390 U.S. at 724-25, 88 S.Ct. at 1320, 20 L.Ed.2d at 259-260.
We are aware, of course, that in Barber v. Page and State v. Hamilton, the constitutional requirement of confrontation in a *254 criminal matter was involved. Nevertheless, the right of cross-examination, and the right to have the jury assess the credibility of a witness' demeanor, attitude, responsiveness, evasiveness and other factors, is also important to litigants in a civil case.
Cognizant of the problem of the presentation of medical and expert testimony, our Supreme Court in 1980 adopted R. 4:14-9 which authorizes de bene esse video-taped depositions of treating physicians and experts whether or not they are within the jurisdiction. R. 4:14-9(e) provides:
Use. Videotaped depositions may be used at trial in accordance with R. 4:16-1. In addition, a videotaped deposition of a treating physician or expert witness, which has been taken in accordance with these rules, may be used at trial in lieu of testimony whether or not such witness is available to testify and provided further that the party who has taken the deposition has produced the witness for further videotaped deposition necessitated by discovery completed following the original videotaped deposition or for other good cause. Disputes among parties regarding the recall of a treating physician or expert witness shall be resolved by motion which shall be made as early as practicable before trial.
The main thrust of the Rule is directed to the taking of de bene esse depositions of treating physicians and experts whether or not they are within the jurisdiction. Pressler, Current N.J. Court Rules, (1988), Comment 1, R. 4:14-9 at 792. The self-evident purpose of these provisions is to avoid the necessity of producing these witnesses at trial because the production of experts at trial has become increasingly burdensome to litigants. Id. The expense of expert testimony has escalated and many experts are willing to give opinions but are not willing to testify in court. Id. Those who are willing are frequently not available on the date scheduled for trial and this results in trial delays, continuances and adjournments, and, frequently, undesirable bifurcations. Id. The Rule is intended to substantially alleviate these problems by permitting the video-taped deposition to be introduced at trial in lieu of the expert's court appearance. Id. As stated in Pressler, supra, comment 6, R. 4:14-9 at 793:
Paragraph (e) of this rule constitutes its central provision, permitting the de bene esse videotaped deposition of an expert to be used at trial whether or not that witness is available to testify. The one qualification imposed by the rule is *255 that the party taking the de bene esse deposition must produce the witness for such further videotaped deposition as is necessitated by discovery completed after the original deposition was taken.
Since the testimony of the 12 expert witnesses was available under R. 4:14-9(e), these witnesses were not "unavailable" and therefore the transcripts of their testimony at the trial in Bendectin Products is not admissible. Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255; State v. Hamilton, 217 N.J. Super. 51.
Although the motion judge held that the transcripts of testimony of plaintiffs' proposed expert witnesses were inadmissible as hearsay evidence,[11] we affirm his decision on the basis that the witnesses were not "unavailable." Thus, we find that the motion judge did not err in barring the transcripts of the testimony of plaintiffs' proposed expert witnesses.

IV
Plaintiffs further contend that the trial judge abused his discretion in bifurcating the issue of liability and damages. Inasmuch as plaintiffs never completed the liability phase of the trial, this issue is moot. Nevertheless, under R. 4:38-2(b), bifurcation of the issues of liability and damages is within the sound discretion of the trial judge, cf. Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 53 (App.Div. 1981), which we will not disturb on appeal absent an abuse of discretion. We find no abuse of discretion here. Nor is there any error in precluding plaintiff from proceeding against the defendant doctors on the doctrine of strict liability. See Feldman v. Lederle Laboratories, 97 N.J. 429, 442-443 (1984) (strict liability, as a matter of public policy, has no application to members of the medical *256 profession); see also Newmark v. Gimbel's, Inc., 54 N.J. 585, 596-597 (1969).
AFFIRMED.
NOTES
[1] All references to plaintiff in the singular will be to Carol Thompson unless otherwise indicated.
[2] Bendectin, as originally formulated, was a combination of three components: dicyclomine hydrochloride, an antispasmodic drug marketed earlier under the name Bentyl; doxylamine succinate an antihistamine marketed earlier under the name Decapryn, and Pyridoxine (Vitamin B6). The composite was approved by the Food and Drug Administration for sale in the United States in 1956 for use in alleviating morning sickness in pregnancy. In 1976 the composition was altered to omit Bentyl. The defendant was its manufacturer. In 1983, in the face of a host of lawsuits and some congressional criticism, the defendant withdrew it from the market. Lynch v. Merrell-National Laboratories, 830 F.2d 1190, 1191 (1st Cir.1987)
[3] Merrell Dow's designation of trial exhibits, which consists of 12 pages, itemizes over 40 published scientific articles and studies dealing with the effects of Bendectin.
[4] Defense counsel later pointed out that the list was not even a list of teratogens; rather, it listed the drug toxicity which may result from drug or chemical administration in late gestation or at birth. Moreover, Doxylamine succinate, the antihistamine component of Bendectin, supra at p. 233, fn. 2, is not even identified as suspect in Casarett and Doull's itemization.
[5] Defendant in Oxendine moved for relief from the judgment, and retrial of the case was ordered. Oxendine v. Merrell Dow Pharmaceuticals, Inc. Civ. No. 1245-82 (Super.Ct.D.C. February 12, 1988) (memorandum order). An appeal from that ruling is now pending before the Court of Appeals, leaving unsettled the ultimate outcome in Oxendine and the decisional foundation thereof. Richardson v. Richardson-Merrell, Inc., 857 F.2d at 825, n. 9.
[6] Plaintiffs here sought to incorporate 12 of those experts' testimony in Bendectin Products as expert testimony in this case. See infra Part II.
[7] Epidemiological studies rely on "statistical methods to detect abnormally high incidences of disease in a study population and to associate those incidences with unusual exposures to suspect environmental factors." Done, "A Commentary on the Use of Epidemiological Cause-In-Fact." 7 Harv.Envtl.L. Rev. 429, 431 (1983).
[8] In the living body as opposed to the test tube or other non-living experimental medium. 2 Schmidt, Attorney's Dictionary of Medicine, (1988) at I-31; compare in vitro (in the test tube, or any other experimental medium not involving an animal or human being. The term is used especially to describe tests performed outside the living body, in contrast to in vivo). Id.
[9] The Bendectin Products case involved over 800 plaintiffs and common issues of liability. It was certified by the trial court as a class action, 102 F.R.D. 239 (S.D.Ohio 1984), but the certification was reversed. In re Bendectin Products Liability Litigation, 749 F.2d 300 (6 Cir.1984). The Sixth Circuit Court of Appeals indicated there were 1180 claims in approximately 844 multi-district cases. In re Bendectin Litigation, 857 F.2d at 293.
[10] Evid.R. 63(3) (Admission of Depositions and Prior Testimony) states that:

Subject to Rule 64 and to the same limitations and objections as though the declarant were testifying in person, and where the declarant is unavailable as a witness, testimony is admissible if (a) it was given by the declarant as a witness in a prior trial of the action or in another action or in a deposition taken in compliance with law for use as testimony in the trial of another action where ... (ii) in a civil case, ... the issue is such that the adverse party on the former occasion had the right and opportunity for cross-examination with an interest and motive similar to that which the adverse party has in the action in which the testimony is offered.... "Unavailable as a witness" as defined in Evid.R. 62(6) means that (a) the witness is dead, or (b) the witness is beyond the jurisdiction of the court's process to compel appearance, or (c) the witness is unable to testify because of then existing physical or mental disability, or (d) the proponent of the statement is unable, despite due diligence, to procure the attendance of the witness. A witness is not unavailable ... when his deposition can be taken by the exercise of reasonable diligence and without undue hardship, and the probable importance of the testimony is such as to justify the expense of taking such deposition.
[11] In Professor Wigmore's view, former testimony is not hearsay at all since it has been subject to cross-examination. 5 Wigmore, Evidence, § 1370 at 55 (Chadbourn Ed. 1974).