Marilyn **TABATCHNICK** and Jay **Tabatchnick**, Plaintiffs,

v.

G. D. **SEARLE & COMPANY** and
**Syntex Laboratories**,
Defendants.

No. 758–70.

United States District Court,
D. New Jersey.

April 11, 1975.

**52**

Fred J. Kalisky, Newark, N. J., Herbert M. Horowitz and Morton Sealove, Julien & Schlesinger, New York City, for plaintiffs.

Raymond M. Tierney, Jr., Shanley & Fisher, Newark, N. J., and John Dames, Chicago, Ill., for defendant G. D. Searle & Co.

Maurice J. Gallipoli, Lamb, Hutchinson, Thompson & Chappell, Jersey City, N. J., for defendant Syntex Laboratories, Inc.

## OPINION

### SUMMARY

User of oral contraceptives sued manufacturers on claim of injury from use. Husband asserted claim *per quod.*

At discovery stage, orders were entered requiring reports of expert witnesses to be furnished, and examination of experts on deposition, to ascertain details of ailment claimed, disease process, etiology and pathology, and medical theory relied on. Orders were complied with for one expert witness, not a treating physician.

After trial began, plaintiffs sought to call a new, additional expert to provide foundation for testimony of noticed expert, and defendants objected. Trial was recessed for taking deposition of proposed new expert. On review of the transcript, the objections were sustained and the new expert was not allowed to testify.

1. Need for additional expert was plain nearly 3 years before trial. Case was calendared for trial for 7 month period, and parties had 2 months notice of peremptory trial date. No unexpected event, such as loss of an expected witness, or other good cause, was shown. Failure to give ample notice before trial to enable defendants to examine new expert and consult own experts in highly technical field would deprive defendants of fair opportunity to prepare for trial and to cross-examine.

2. Notice of proposed new expert, given after trial began, is not in compliance with pretrial order for disclosure as soon as feasible, when order was entered more than 1 year before trial. Such notice also is not "seasonable" compliance with the continuing duty imposed by F.R.Civ.P. 26(e)(1).

3. Proposed expert witness, not a treating physician, would not be allowed to testify to his opinion based on selection of some facts from hospital records and disagreement with others.

4. Proposed expert witness would not be allowed to testify to opinion embracing ultimate issue on cause-and-effect relationship when opinion was a bare conclusion without supporting facts and rationale calling for an expertise he did not possess. Fed.Ev.Rule 704; N.J.Ev. Rule 56(3).

5. Consequences of plaintiffs' failure adequately to prepare for trial cannot be visited on defendants.

BIUNNO, District Judge.

Should a party be allowed, over objection, to call an expert witness to testify at trial when notice of his identity and of the intention to call him was first given after trial began, and when the witness is not one whose name was listed in response to interrogatories and a discovery order before trial?

The objection was sustained orally at trial, with indication on the record that a formal opinion would be filed later.

The suit claims damages for personal injuries sustained by plaintiff wife (and

per quod by plaintiff husband) from having taken oral contraceptive medications. The history shown so far is that after the birth of her second child, the wife's menstrual cycle did not resume. The physician in whose care she was administered unspecified medications by injection, and then prescribed oral contraceptive A. While the evidence is not clear, it suggests that the medication was prescribed to regularize the menstrual period. These were taken for a period of 10 months, when the physician changed the prescription to another brand. The husband testified that he once picked up the package from the drug store, and asserts that he saw on it the name of oral contraceptive B, but there is some doubt of this because in his stock brokerage business he had been following the market performance and activity of the stock of the manufacturer of that brand, and had read articles about it, so that his present recollection may be due to an association in his mind from those articles rather than from what he saw on a package. If he saw an array of packages, he felt he could select the one he saw, but had never done this.

In any event, according to the wife's testimony, the change made by the physician was to oral contraceptive C, which she says she took for about one and one half to two years. After that, she was under the care of another physician who prescribed an estrogen medication which she took daily over a period of some 2 to 3 years, during which she did not take an oral contraceptive.

In this diversity action, the defendants are the manufacturers of products A and B. The manufacturer of product C is defendant in a separate action in the Superior Court of New Jersey, filed about two years later when the deposition of the treating physician disclosed he had prescribed it and had not prescribed product B. That defendant could not be joined here for lack of diversity.

At an early stage of the case, defendants served interrogatories. One question asked for an identification of all expert witnesses proposed to be called, with copies of any reports. The question was expressed to be a continuing one. See F.R.Civ.P. 26(b)(4), and Friedenthal, "Discovery and Use of An Adverse Party's Expert Information", 14 Stan.L.R. 455 (1962).

Following receipt of the answer to the interrogatory, and a series of motions and orders to supply reports and submit the expert to questioning to discover what the expert was going to say in respect to the details of the specific ailment, the disease process, the etiology, the pathology, and the medical theory relied on, plaintiffs responded with the name of a single expert witness, Dr. Hillabrand, an obstetrician and gynecologist. His deposition was taken. In a number of technical areas, his response was that he could not answer the questions because he was not a neurologist. At other times he explained that he was basing his opinion on the contents of the hospital records, which he accepted; he had not seen the patient at the time, and the medical record was taken as history.

After the jury was drawn, plaintiffs engaged another expert, a neurosurgeon, who had no prior knowledge of the case. He performed a neurological examination of the wife, examined hospital records, and later on inspected a number of X-rays (mainly angiograms) from the hospital records as well as sets of slides of tissues from the hospital records. He took some history from the plaintiffs and their counsel.

The matter first came to the court's attention during trial, in connection with inquiries about when the next witness would be ready. Plaintiffs explained that they wished to call the newly-hired expert first because his testimony would be essential as foundation for Dr. Hillabrand's testimony (presumably, in respect to areas of neurology for

which he lacked competence), and at this point the objections were made.

Defendants pointed to the record on interrogatories, the earlier motions and orders, and exchanges of correspondence to establish that they would be wholly unequipped to proceed with cross-examination of a witness called on a highly-technical aspect without having had pre-trial discovery and consultation with their own experts. To allow the new expert, they said, would alter the theory of the case and make everything "a new ball game."

Plaintiffs relied on a provision of the pretrial order, which said that they anticipated calling two experts; "no limit" was imposed, but the order did direct that information be exchanged as soon as feasible. This was in September, 1973.

At that stage, the court ruled that it would reserve on the objections until the new expert was examined on deposition, which he was for one and one-half days, the trial being recessed meanwhile.

Upon reading the transcript of the deposition, several items appeared clearly. First, there is no question that the new expert took a history from the plaintiffs and their counsel. No detailed record of that history was made, in some respects it varies from the evidence at trial, and in other respects it omits items put in evidence at trial, Second, the new expert arrived at an opinion from the history he was given, from the X-rays and slides he examined, and from data in the hospital records, some of which he accepted and other parts of which he disagreed with. Third, his opinion of the disease process and etiology differed from that of Dr. Hillabrand, as disclosed by his deposition, although his conclusion was the same. Fourth, when asked to explain what the cause-and-effect relationship was between the oral contraceptives and the injury sustained, he replied that he was not an expert on oral contraceptives.

The orders entered by Judge Garth on January 4, 1972 and March 3, 1972, along with the related correspondence withdrawing proposed experts other than Dr. Hillabrand are the law of the case, and binding on the parties and the court. The purpose of discovery is to explore everything available and narrow down the fact issues in controversy so that the trial process may be efficient and economical. The calling of a new expert, not hired until after the jury was drawn, would have the opposite effect. It would create new fact issues and mushroom or balloon the trial. At the same time it would unfairly destroy the means for informative cross-examination on the basis of pretrial preparation.

Plaintiffs' counsel were aware, at least from the time that Dr. Hillabrand's last transcript was filed with the clerk on September 28, 1972, that there were fact areas in the field of neurology that he was not equipped to deal with and did not deal with. The case was on the calendar issued in August, 1974 for trial in September. Other commitments precluded the availability of all counsel at that time, and it was indicated that they could be ready as the first case in January, 1975. Inquiry made in December, 1974 disclosed that there were problems with a January date, and after further exchanges on availability, a direction was issued in January, 1975 setting the case peremptorily for trial on March 11, 1975. Thus, there was ample opportunity to review the file and to appreciate that Dr. Hillabrand's testimony would lack probative value without supporting evidence from a neurologist. Yet, nothing was done.

In the period from September, 1973, if a timely application had been made, a proposal to call another expert might well have been accommodated, depending on the breadth and depth of his proposed testimony. Or, if plaintiffs had given notice of some other expert who had been examined, and some unexpected

event had occurred to make him unavailable, an application to replace him with another and meanwhile put off the trial could have been accommodated; but nothing of this sort occurred.

To the extent that the pretrial order of September, 1973 indicated an expectation of two expert witnesses for plaintiff, without limit, it must be read in light of the prior orders of Judge Garth, and in light of the requirement to make informative disclosures as soon as feasible. Whatever else that term means, it implies a time long enough before trial to permit a fair opportunity to prepare for trial. A disclosure after the jury is drawn falls far short of any reasonable interpretation of the pretrial order.

Rule 26(e)(1) of the Federal Rules of Civil Procedure is also pertinent. So far as applicable here, that rule imposes a duty to supplement responses for discovery addressed to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony." This duty is directed to be discharged "seasonably". In the absence of unexpected developments, supplementation after the jury has been drawn cannot be considered to have been made "seasonably". The subjective explanation for the default is irrelevant. It makes no difference whether it was due to failure to prepare for trial or to an intentional purpose to gain the benefit of surprise. The rule bars the result without regard to cause, except for those beyond control.

Aside from these considerations, the new expert could not be allowed to testify at all. His voir dire examination by the court, coupled with his testimony on deposition, make that conclusion inescapable. Both the new Federal Rules of Evidence which will take effect July 1, 1975, and the New Jersey Rules of Evidence, are compatible on

this score. While Fed.Ev.Rule 704 and N.J.Ev.Rule 56(3) both allow the expert's opinion to "embrace the ultimate issue" to be decided, neither rule allows a bare conclusion which lacks supporting data and rationale leading to that conclusion. The sole justification and purpose of expert testimony is to assist the trier of fact to find a solid path through an unfamiliar and esoteric field.

This is most important where the issue is the probability of cause-and-effect as distinguished from mere association, and it is especially important when the subject is emotionally charged, as it is here.

Those who support family planning and population control have pressed strongly for devices and medications that can achieve the goals they consider vital. With equal intensity, their efforts have been opposed by those who object to any interference with natural processes, on either moral or religious grounds. In a judicial proceeding, impartiality and objectivity are essential and the subjective notions of policy sincerely held by the contending factions must be excluded. To allow a bare conclusion to be expressed by the new expert who concedes that he lacks the competence to provide etiology for oral contraceptives would fail to meet that standard. His testimony could only confuse or mislead a jury.

This lack of competence was emphasized by his statement on the deposition that "there was no question as to the etiology because when the pill was stopped the symptoms disappeared *and didn't return*." His opinion that there was a cause-and-effect relationship is thus shown to be bare conclusion because the testimony was that although the wife stopped taking oral contraceptives in June, 1965, the same symptoms continued until she experienced the cerebral accident in January of 1968, two and one-half years later. The new expert evidently was not informed of this.

The new expert's proposed testimony was potentially confusing on another score, namely insofar as he "disagreed" with the entries in the hospital records. Here, it is important to emphasize the purpose of offering the hospital records as "business records" under either Fed. Ev.Rule 803(6) or N.J.Ev.Rule 63(13). Although hearsay by definition, both rules allow the introduction of the records to prove the facts stated in them. Having done so, a party cannot be allowed to call a witness who will use some of those facts and reject others, in order to provide support for an expert opinion. It must be kept in mind that plaintiffs did not call, and stated they did not intend to call, the treating physicians whose work was reflected in the records, and the risk of confusing or misleading the jury would be great.

This situation is to be distinguished from a case in which a claim of malpractice is asserted against a treating physician. In such cases, the hospital or medical records are introduced for an entirely different purpose, namely, to establish what knowledge he had, what diagnosis he made and what treatment he prescribed. In such cases, the records are received as statements against the interest of a party, under Fed.Ev.Rule 801(d)(2), and N.J.Ev.Rule 63(7) and may, of course, be challenged to show the claimed breach of duty. Here, no claim was asserted against the treating physicians and none was a party.

The dangers to impartial and objective evaluation by the jury are well illustrated by a particular item in controversy. The hospital records show that at the wife's admission, the tests resulted in several potential diagnoses, of which one was "arteriovenous malformation" on the left side of the brain. This term, abbreviated to AVM, describes a congenital defect in which there is a vascular shunt connecting an artery to a vein so that blood passes directly from one to the other without first being diffused through a system of capillaries. Since the arterial pressure is higher than the venous pressure, the ensuing stress can cause a vascular accident in which free blood hemorrhages and builds up pressures against the brain. There was no dispute that this condition could not be attributed to oral contraceptives.

The treating physician performed brain surgery (a craniotomy), and the notes show that he found an AVM along with other conditions. The new expert's deposition disclosed his opinion to be that the patient did not have an AVM; he disagreed with both the preliminary diagnosis, the surgical notes and the final diagnosis. The treating physician saw the surgical field; the new expert did not. This would allow the new expert to cancel and ignore entries in the hospital records without any facts being put in evidence to support him. To allow him to testify along these lines would be to allow him to say anything he wished without effective means for testing his opinion on cross-examination.

Another area of concern for confusion and misleading was that involving the tissue slides for pathological study. As to them, the new expert said he did not see what was recorded in the reports. When asked to explain this he said that tissue slides, when examined under the microscope, display patterns of cells similar to cubistart; that what is "seen" depends on the viewer. He said that if two viewers came to different conclusions, perhaps a third might be asked to view the slides, but that in any event the final diagnosis was made by the physician responsible for the patient, the treating physician. He conceded that he did not have that responsibility in this case.

Testimony of this kind cannot be helpful to a jury and with the explanation given, the jury could examine the slides with no more guidance than if they were looking at ink blots. Thus, again, the witness would be free to say anything, and the testing of evidence by cross-examination would be non-existent.

In sum, both for failure to comply with orders in the case and the discovery rules, and for failure to show that the proferred testimony would be helpful to the jury, the witness cannot be allowed to testify. Rulings of this kind are not made lightly. In this case, the result is inescapable because it is plainly evident that the plaintiffs' dilemma is attributable entirely to a failure to properly prepare for trial although more than ample time was available. The consequences cannot be visited on defendants.

On its face, the statute of limitations on oral contraceptive A had run out in 1965, and on oral contraceptive B (if it was ever taken at all), no later than mid-1967. If the "discovery" rule were applied, the calamatous event occurred in January, 1968, and if a year be considered a reasonable time thereafter, the statute would have run in January, 1969. Suit was not filed until mid-1970. Plaintiffs seem to have made no attempt to gather facts from the string of treating physicians, and instead attempted to construct a claim based on theory, to support which they picked and chose those facts favorable to the theory.

As Thomas Wolfe said nearly a half-century ago, in his preface to "Look Homeward, Angel",

"Fiction is not fact, but fiction is fact selected and understood, fiction is fact arranged and charged with purpose."

Great novels may rest on that foundation; the trial process may not.

The objections advanced by defendants are sustained.

It should be emphasized that this ruling reflects policies that are common to all parties. They apply to defendants as well as plaintiffs.

The usual period set for the completion of discovery ends 90 days after issue joined, under Local Rule 15 subd. A, and further discovery requires an order of the court, for which proper cause must be shown.

The bar allowed to practice before the federal court here is put on notice by this ruling that cases must be prepared for trial, and that the consequences of failure to do so will fall on their own clients.