**Dana Marie BOYLES, by her parents and natural guardians, Dennis BOYLES and Donna Boyles, Dennis Boyles, individually, and Donna Boyles, individually, Plaintiffs,**

v.

**AMERICAN CYANAMID COMPANY, Defendant.**

No. 87 CV 3357 (SJ).

United States District Court, E.D. New York.

June 15, 1992.

---

Grutman Greene & Humphrey by Joseph Santora, New York City, for plaintiffs.

Porzio, Bromberg & Newman, P.C. by Myron J. Bromberg, Anita Hotchkiss, Angela Slater, New York City, for defendant.

## MEMORANDUM AND ORDER

JOHNSON, District Judge:

This is a tort action filed by Dana Marie Boyles (the "Infant Plaintiff") by her parents and natural guardians, and by each of her parents, Donna and Dennis Boyles, individually, against American Cyanamid Company ("Cyanamid"). Essentially, plaintiffs contend that on October 6, 1984, Donna Boyles was exposed to an allegedly toxic airborne emission that emanated from a chemical explosion at Cyanamid's plant in Linden, New Jersey. Each of the claims by each of the plaintiffs arises from the damages allegedly caused by the Cyanamid chemical explosion.

Pending before this court are motions by Cyanamid first, to preclude the testimony of plaintiffs' experts at trial on the grounds that such testimony is inadmissible under F.R.Evid. 702, 703 and 403; and, second, for partial summary judgment pursuant to F.R.Civ.P. 56 on the ground that, absent the expert testimony to establish causation, plaintiffs cannot sustain their burden of proof.

The parties have fully briefed the issues at hand and oral argument was heard on December 20, 1991.

## BACKGROUND

On October 6, 1984, at approximately 10:10 a.m., a storage tank containing malathion[1] exploded at the Cyanamid plant in Linden, New Jersey causing the emission of various chemicals into the air.[2] At the time of the explosion, Donna Boyles, who was three months pregnant, was in Staten Island, New York visiting a neighbor. The neighbor's home was located roughly 4 miles southeast of the Cyanamid plant. During the emission, Mrs. Boyles went outdoors for about 10 minutes. Thereafter, she claims to have experienced nausea and lightheadedness.

Upon experiencing these symptoms, Mrs. Boyles contacted her physician who advised her that neither an office nor a hospital visit was necessary. Mrs. Boyles experienced nausea and fainting for the remainder of her pregnancy. After giving birth to the Infant Plaintiff, Mrs. Boyles ceased experiencing any of these symptoms. The Infant Plaintiff was born with approximately twenty eight congenital abnormalities.

The plaintiffs allege that the emissions from the Cyanamid explosion were toxic and caused, *inter alia,* the Infant Plaintiff's congenital abnormalities. Plaintiffs have offered the testimony of Drs. Amato and Holson to support their theory of causation. At the core of this dispute is the question of the admissibility at trial of the testimony of Drs. Amato and Holson to establish medical causation, that is, the teratogenetic[3] effect of malathion, isomalathion[4] and the other chemicals identified on plaintiffs' submissions made pursuant to F.R.Civ.P. 26 (the "Rule 26" chemicals").

a. *Legal Standards Governing Expert Opinion.*

"In determining whether an expert opinion is sufficient to withstand a summary judgment motion, courts undertake a detailed inquiry into the admissibility of the proffered testimony ... Rule 104(a) of the Federal Rules of Evidence requires a court to make a preliminary inquiry into the admissibility of expert testimony. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 260 (3d Cir.1983) ..., *cert granted,* [471] U.S. [1002], 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). The preponderance of the evidence standard generally governs in such a determination...." *In re Agent Orange Product Liability Lit.,* 611 F.Supp. 1223, 1239 (E.D.N.Y.1985) *aff'd* 818 F.2d 187 (2d Cir.1987); *see also, Christophersen v. Allied–Signal Corp,* 939 F.2d 1106 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992); *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987); *In re Japanese Electronic Products,* 723 F.2d 238, 276 (3d Cir.1983). In a case as emotionally charged as this one, it is all the more necessary for a court to examine the reliability of the experts testimony. *See Tabatchnick v. G.D. Searle & Co.,* 67 F.R.D. 49 (D.N.J.1975).

(i) Rule 702.

Fed.R.Evid. 702 permits expert testimony "if scientific, technical or other specialized knowledge will assist the trier of fact to determine a fact in issue" and the witness is qualified as an expert by knowledge, experience, training or education. Although Cyanamid does not contest plaintiff's qualifications as experts in the instant motion,[5] it has reserved the right to

---

1. Malathion is an organophosphate pesticide which is registered with the United States Environmental Protection Agency (the "EPA") pursuant to the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et. seq.*

2. For purposes of this motion, the court assumes that chemicals released into the air on October 6, 1984 are all those listed in submissions by plaintiffs in accordance with F.R.Civ.P. 26.

3. Teratogenesis is the production of physical defects in offspring *in utero.* J.E. Schmidt, M.D., *Attorney's Dictionary of Medicine,* § T–126 (Matthew Bender 1992).

4. Isomalathion is an isomer of malathion. That is, isomalathion is a chemical compound that has the same kind and same number of atoms in each molecule, but differing in the manner in which the atoms are arranged within the molecule. Isomers differ in physical and chemical properties. *See* J.E. Schmidt, M.D., *Attorney's Dictionary of Medicine,* § I–124 (Matthew Bender 1992).

5. Defendant's Memorandum of Law at 2, n. 2

do so in the event that this case goes to trial.

(ii) Rule 703 and 403.

■ Assuming for present purposes that the experts offered by the plaintiffs are qualified, thereby meeting the Rule 702 threshold standard, the admissibility of their testimony turns on whether (1) each opinion will assist the trier of fact; (2) the facts or data in the particular case upon which each expert bases his opinion are of a type reasonably relied upon by experts in the field, F.R.Evid. 703; and (3) in reaching his conclusion, the expert used a well-founded methodology. *In re Agent Orange,* 611 F.Supp at 1244; *see also, United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.1992) (*citing United States v. Williams,* 583 F.2d 1194 (2d Cir.1978)); *Cummiskey v. Chandris, S.A.,* 719 F.Supp. 1183, 1188–89 (S.D.N.Y.1989), *aff'd,* 895 F.2d 107 (2d Cir.1990).

If the experts' opinions pass muster under Rule 703, the court must then ascertain, in accordance with Rule 403, whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading of the trier of fact.

## DISCUSSION

### (a) R. Stephen Amato, M.D.

■ Although Dr. Amato refers to numerous articles that discuss malathion and isomalathion, none of them advance or support the conclusion Dr. Amato draws that such chemical agents cause human retardation *in utero*.[6] Indeed, his opinion is fundamentally unsupported. As Dr. Amato's

deposition testimony makes clear, there exists no epidemiological or experimental animal study which supports his opinion as to the teratogenic effect of these chemical agents.

Malathion, an organophosphate pesticide that is registered with the Environmental Protection Agency and approved for use in the United States, has been subject to numerous, extensive studies. Research has shown that malathion does not affect any organ system directly, nor does it alter the anatomical structure of vital organs. It has but one well-recognized effect which is to act as an of a group of enzymes called cholinesterase. When cholinesterase release is inhibited, there is a temporary disruption of nerve function, causing temporary paralysis. The body continually reproduces cholinesterase and, as such, this impairment of muscle function generally lasts for a period of 24 to 48 hours.

At best, the articles referenced by Dr. Amato in his affidavit,[7] lend credence to the view that (1) human skin contact with extremely high levels of malathion resulting in dermal absorption may increase toxicity in humans; and (2) the presence of isomalathion may further exacerbate this toxicity.[8]

To the extent that any existing scientific literature addresses the toxic effect of malathion, however, such studies are inapposite to the situation presented herein.[9] For instance, Dr. Amato relies upon an incident in Pakistan where the field workers who were employing malathion in an effort to effectuate a malaria control program. Such workers, however, were physically soaked in malathion over the course of a

---

**6.** Dr. Amato has conceded that various abnormalities (*e.g.,* the coloboma) suffered by the Infant Plaintiff developed prior to Mrs. Boyles' exposure to the various identified chemicals on October 6, 1984.

**7.** Cyanamid urges this court to disregard the Amato affidavit because it relies upon articles never previously referenced in the past and upon which Cyanamid has not had an opportunity to question Dr. Amato. Exclusion of this evidence is quite a harsh sanction and it is the better practice in this Circuit to address issues of such import on their merits. *See Agent Or-*

*ange,* 611 F.Supp. at 1243; F.R.Civ.P. 1. Therefore, this court has considered all of Dr. Amato's submission's in resolving the instant motion.

**8.** *See e.g.,* Baker, E.L. et. al., *Epidemic Malathion Poisoning in Pakistan Malaria Workers,* The Lancet, 331–334 (January 7, 1978).

**9.** *See also,* Nicholas, A., Vienne, M., and Van Den Berghe, H., *Induction of Sister–Chromotoid Exchanges in Cultured Human Cells By An Organophosphorus Insecticide Malathion,* Mutation Research 67:167–72 (1979).

six day period.[10] The Pakistani incident thus is hardly analogous to the situation presented herein where Mrs. Boyles, fully clothed, was exposed, for about 10 minutes, to an airborne emission that emanated from a site four miles from the Cyanamid plant.[11]

Furthermore, even though potentially toxic, not a single *in vivo*[12] or *in vitro* study has ever found that such chemicals agents have a causal association with birth defects. Indeed, the authors of the sole piece of literature which tangentially addresses a possible teratogenic effect of malathion make patently clear that case control and experimental animal studies are necessary before any link between malathion and human developmental toxicity may be established.[13]

Essentially, Amato opines that the chemicals to which Mrs. Boyles are teratogenic based on a single case report of the Infant Plaintiff and without any other facts to substantiate his opinion. *Compare, United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.1981). Such methodology alone is specious and is a fundamentally speculative approach. *See Richardson v. Richardson–Merrell*, 857 F.2d 823, 830 (D.C.Circuit 1988); *Agent Orange*, 611 F.Supp. at 1231. As even Dr. Amato admits, such an approach is not one that is ordinarily or reasonably relied upon by scientists to opine as to the causal relationship between a chemical agent and human developmental toxicity. *See also, In re Japanese Electronic Products*, 723 F.2d at 276–77.

### (b) Joseph Holson, Ph.D.

Likewise, the opinion of Dr. Holson lacks medical or scientific substantiation. Dr. Holson's opinion does not rely on any scientific literature. There is no evidence—no epidemiological, experimental animal or other controlled study—which suggests that malathion, isomalathion or any of the other Rule 26 chemicals is likely to cause birth defects. Dr. Holson, too, relies on nothing more than the Boyles case to opine that the chemical agents are teratogenic, all the while conceding that one case report is insufficient to scientifically establish a cause and effect relationship where alleged human developmental toxicity is implicated.

Dr. Holson could not explain the process by which malathion is metabolized by the human body, let alone offer an explanation as to how malathion affects the central nervous system *in utero*. Relying largely on Mrs. Boyles' deposition testimony, her reproductive and family history and the occurrence of the October 6th explosion, Holson asserts the existence of a cause and effect relationship.[14] At its core, Dr. Holson uses the coincidental occurrence of the explosion and the alleged symptoms to opine as he does. This approach is unreliable and certainly not one ordinarily employed by the scientific community to establish the teratogenicity of a chemical agent.

---

**10.** The amount of exposure equalled 100 to 460 times the daily respiratory dose. Baker, E.L. et. al., *Epidemic Malathion Poisoning in Pakistan Malaria Workers*, The Lancet, 333 (January 7, 1978).

**11.** Notably, the Pakistani study found that "[d]ermal absorption resulting from excessive skin contact during spraying and mixing operations was the primary route of pesticide uptake; respiratory exposure was relatively unimportant." Baker, E.L. et. al., *Epidemic Malathion Poisoning in Pakistan Malaria Workers*, The Lancet, 333 (January 7, 1978).

**12.** In vivo research pertains to events occurring within the living body. In vitro refers to research or analysis performed in a glass dish, test tube, or other artificial environment. *Dorland's Illustrated Medical Dictionary* (26th ed. 1981).

**13.** Lindhaut, D. and Hageman, G., *Amyoplasia Congenita–Like Condition and Materna; Malathion Exposure*, Teratology 36:7–9 (1987); Hall, J., Comments on *"Amyoplasia Congenita–Like Condition and Maternal Malathion Exposure":* Is All Amyoplasia Amyoplasia?, Teratology 38: 493–94 (1988); Lindhaut, D. and Hageman, G., *Reply to the Letter by Judith G. Hall Entitled Is All Amyoplasia Amyoplasia?*, Teratology 38: 495 (1988).

**14.** He, like Dr. Amato, determined that at least some of the congenital abnormalities are attributable to factors others than the chemical exposure (or, have idiopathic etiologies). Additionally, Holson knew little about the Boyles pregnancy other than that which culled from her deposition testimony.

Like Dr. Amato, Dr. Holson refers to the Pakistani incident to support his the conclusions reached here. For the reasons set forth above, that incident is inapposite. Additionally, at his deposition, Dr. Holson recognized that there is an enormous difference between *in vivo* testing for toxicity and testing for the teratogenicity of a chemical agent.

To summarize, each of the experts' proffered testimony amounts to bare conclusory allegations, thereby lacking the indicia of reliability that would cause it to assist a trier of fact. *Compare Tabatchnick*, 67 F.R.D. at 55. Each expert's methodology amounts to little more that a giant leap of faith from the alleged coincidence of the chemical exposure and Mrs. Boyles' experiencing of certain symptoms. The exclusion of both experts herein is compelled by the nonexistence of any medical or scientific study which supports their conclusions.

Neither expert relies on scientific data generally relied upon by other experts in the field, namely epidemiological and experimental animal studies, which support their point of view. Contrarily, the experts' references to existing scientific literature distort the thrust of such literature and confound the issue raised in the instant action by drawing analogies to situations that differ markedly than the one before this court.

Because Drs. Amato and Holson do not rely upon facts or data or employ a methodology that other experts would reasonably rely upon to reach a medical or scientific conclusion of the sort each of them reaches, their testimony would not assist the trier of fact in reaching a decision and fails to meet Rule 703's standards. Each of their testimony tends to raise more questions than it answers. On this basis, the court finds that Drs. Amato and Holson's testimony is inadmissible at trial.[15]

### (c) Summary Judgment

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Eastman Machine Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In addition, summary judgment is appropriate against a nonmovant who, after adequate time for discovery, fails to establish the existence of an element that is essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *United States v. Pilot Petroleum Associates, Inc.*, 712 F.Supp. 1077, 1081 (E.D.N.Y. 1989). In light of the foregoing evidentiary ruling that the plaintiffs' proffered expert testimony is inadmissible at trial, plaintiffs' will not be able to sustain their burden of proof on causation at trial. As such, partial summary judgment in favor Cyanamid is warranted at this time.

### CONCLUSION

For the reasons set forth above, the court finds that the proffered expert testimony of Stephen S. Amato, M.D. and Joseph P. Holson to be inadmissible. Accordingly, Cyanamid's summary judgment motion is granted as to the claims assert in counts 1, 2 (partial) and 3–6 of plaintiffs' complaint.

So ordered.

---

**15.** Because the testimony of the experts do not meet the Rule 703 standards, this court need not reach the analysis provided for in Rule 403.